IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED STATES, *ex rel.* DEBRA PARKS, *et al.* | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No.: RDB-06-2411 |
| ALPHARMA INC., *et al.* | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM OPINION**

Plaintiff Debra Parks ("Parks") is a former employee of Defendant Alpharma Inc. ("Alpharma"), and brings this action under the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*. Parks filed the complaint in this action in September, 2006, and it remained under seal while the Department of Justice investigated the allegations. In March, 2010, the Department of Justice and Alpharma reached a settlement, and the case was unsealed. Pursuant to the settlement agreement, Parks received over five million dollars, and all claims against Alpharma were dismissed with the exception of Parks's sole remaining claim for retaliation under Section 3730(h) of the False Claims Act, which is often referred to as the "whistleblower" provision of the Act, designed to protect employees who assist in bringing *qui tam* actions. 31 U.S.C. § 3730(h). Presently pending before this Court is Defendant Alpharma's Motion for Summary Judgment. The motion has been fully briefed, and this Court held a hearing on April 1, 2011 pursuant to Local Rule 105.6 (D. Md. 2010).

For the reasons that follow, Defendant Alpharma's Motion for Summary Judgment (ECF No. 69) is GRANTED.

**FACTUAL AND PROCEDURAL BACKGROUND**

Parks was employed as a sales representative at Alpharma from April 2002, until July, 2006. Her primary responsibilities involved promoting the drug Kadian,[1] a slow-release form of morphine used to manage pain that Alpharma marketed as superior to other opioids. Parks was extremely successful—she accrued numerous awards and was consistently ranked near the top of Alpharma's sales representatives nationally throughout her employment with the company.

Doctor Michael S. Kaplan prescribed the most Kadian in Parks's territory, and was therefore her most important prescriber. Despite the fact that Parks found Dr. Kaplan personally objectionable, she wrote in an e-mail that she "would be dead if he got mad and stopped writing [prescriptions]" for Kadian. Parks Dep. 74-76, Ex. 8. In early 2004, Alpharma considered entering into a clinical study agreement with Dr. Kaplan in order to assess the efficacy and pharmacoeconomic impact of switching patients from other opioids to Kadian. Parks urged and encouraged Alpharma to fund such a study, and reiterated the importance of his prescription writing volume to her sales performance. *See id.* 477-491, Exs.49-53. Indeed, Parks noted that Dr. Kaplan is "truly a doctor we want to keep in our camp." *Id.* Ex. 49. Alpharma eventually did fund the Kaplan "switch" study, and paid Dr. Kaplan a substantial sum for his involvement. Although while employed at Alpharma, Parks

---

[1] Because Kadian may only be sold to the public via a prescription issued by a physician, Mrs. Parks did not "sell" the drug, but rather, met with doctors in order to urge them to prescribe it.

2

endorsed Dr. Kaplan, and urged Alpharma to fund a study to be run by him, in her complaint filed after her termination, she alleges that she made numerous complaints about the switch study and Alpharma's actions relating to it.[2] In particular, she alleges that Alpharma "buried" the results of the switch study when those results would not assist Alpharma in further marketing and promoting Kadian.

In addition to conducting the switch study, Dr. Kaplan, in August 2005, gave a presentation to Alpharma sales representatives regarding his personal method of converting patients from other opioids to Kadian. Parks alleges that despite the fact that Dr. Kaplan was presenting his "personal" conversion method, Alpharma hired him for the purpose of training sales representatives so that they could present the Kaplan conversion method to other physicians. Parks claims that she complained to her superiors at Alpharma that many of the sales representatives did not understand the conversion method, and that Dr. Kaplan's conversion method was an "off-label" use of the drug, and therefore Alpharma was prohibited from promoting the Kaplan conversion method.[3]

---

[2] The specific allegations made by Mrs. Parks are central to this Court's analysis of whether her claims should survive Alpharma's motion for summary judgment. As such, those allegations are more properly considered in the analysis section *infra*. This background section sets out the general framework and posture of the case. Moreover, it should be noted that the Second Amended Complaint in this case is 92 pages long, and consists of 26 separate counts and 448 paragraphs. Needless to say, the allegations contained in the complaint are much broader than those considered by this Court in the context of this single count False Claims Act retaliation case. For purposes of evaluating the claim of retaliation, this Court need not conduct an analysis of the merits of the various allegations and the factors underlying Alpharma's settlement with the Department of Justice.

[3] A drug that has been approved by the Food and Drug Administration ("FDA") for a particular use may have other, unapproved uses. These unapproved uses are referred to as "off-label" uses. Many drugs have recognized off-label uses, and there are no laws or regulations prohibiting the prescribing or personal use of drugs in an off-label manner. However, regulations do prohibit drug manufacturers from marketing their drugs for off-label purposes. *See* 21 U.S.C. §§ 331(a), (d);

3

Parks also claims that she complained to her Alpharma supervisors about a presentation that Dr. Kaplan gave to Coventry Health Care in February 2006. Although Parks played a significant role in securing Dr. Kaplan's participation in the presentation, she claims that she objected to both the content of the presentation and the method by which Alpharma paid Dr. Kaplan for his time. She claims that Dr. Kaplan's presentation was "off-label," and therefore improper. Moreover, Dr. Kaplan was not on Alpharma's list of approved speakers as a result of his decision not to participate in a training session, and therefore could not be paid through the normal channels. Parks's supervisors apparently encouraged her to buy Dr. Kaplan a gift certificate in lieu of issuing a check, but Parks refused. Regardless, Dr. Kaplan was eventually paid for the Coventry presentation via a check issued by Alpharma.

Parks also alleges that as a result of a FDA investigation involving a competitor's drug and its risk of "dose-dumping," Alpharma conducted a study to determine if Kadian had similar risks of dose-dumping, that is, releasing too much morphine when consumed with alcohol. Despite the fact that Alpharma's tests indicated that Kadian did not suffer from dose-dumping risks, Parks nevertheless alleges that Alpharma marketed Kadian as "safe" with alcohol prior to the release of the study results. Parks claims that she objected to this line of marketing.

Finally, Parks claims that she objected to Alpharma's use of an internet surveillance study designed to monitor web sites associated with abuse of pain medication. Alpharma apparently monitored these web sites in order to tabulate how often its drug Kadian was

---

*Washington Legal Foundation v. Henney*, 202 F.3d 331, 332-33 (D.C. Cir. 2000) (providing background on "off-label" use and promotion of pharmaceutical drugs).

4

mentioned. Kadian was mentioned infrequently, and Parks alleges that Alpharma used the results of the study to promote Kadian as being less susceptible to abuse and diversion than other opioids, such as Percocet or Vicodin.

In March 2006, Regina Donohue, Alpharma's Director of Human Resources, received telephone calls from sales representatives complaining about Parks's behavior. Specifically, the sales representatives complained that Parks was engaging in negative gossip concerning a purported extramarital relationship between one of her managers, Peter Hill, and a fellow sales representative. In addition, it was reported to Ms. Donohue that Parks was complaining about her merit pay increase for the year 2005.

Ms. Donohue conducted an investigation into Parks's behavior, and in the process, spoke to several of Parks's co-workers. Ms. Donohue took copious notes of her conversations and documented the fact that numerous employees complained about Parks's behavior. Mrs. Donohue, and another human resources manager met with Parks on May 5, 2006 to discuss the complaints leveled against her. Shortly following that meeting, Parks, through counsel, sent a letter to Alpharma alleging that Mr. Hill was "retaliating" against Parks by claiming that she had spread false rumors about him. In the letter, Mrs. Parks requested that Alpharma investigate her allegations. Alpharma did investigate, and found no support for Parks's allegations.

Ms. Donohue met with Parks to discuss the results of the investigation. Ms. Donohue told Parks that no disciplinary action would be taken against her, but that she should keep the fact that the investigation was conducted, and the underlying allegations confidential. In June 2006, Ms. Donohue was informed by other Alpharma employees that

Parks had questioned them about the investigation, thereby violating the confidentiality requirement. According to Alpharma, the company's management decided to terminate Parks's employment as a result of the numerous complaints regarding her subversive behavior and as a result of her failure to keep the internal investigation regarding her allegations confidential. Parks contends that the company's decision to fire her stemmed from her complaints and objections regarding Dr. Kaplan, and Alpharma's alleged off-label marketing of Kadian. Alpharma terminated Mrs. Parks on July 24, 2006.

Shortly thereafter, Parks filed a criminal complaint against Mr. Hill alleging that he committed assault and battery when he "smacked [her] on [her] butt" at a conference in Orlando, Florida prior to her termination. Parks Dep. 368-69. Apparently, several of Parks's co-workers signed statements indicating that Parks had asked them to lie in order to state that they had witnessed the alleged battery. Subsequently, the Orlando police dropped the investigation. *See* Donohue Decl. ¶¶ 53-54, 56, 58, and accompanying exhibits.

As previously mentioned, Parks filed the complaint in this action in September 2006, and a settlement was reached between the Department of Justice and Alpharma in March 2010. However, in May 2007, Parks filed a separate action for defamation against Mr. Hill and another sales representative in the Circuit Court of Maryland for Baltimore County. *See* Parks Dep. 213, Ex. 33. In that complaint, Parks alleged that Mr. Hill and the sales representative engaged in a conspiracy to get her fired by Alpharma by defaming her. Specifically, she alleges that Mr. Hill and others conspired to tell Alpharma that Parks was spreading rumors about an extramarital affair that Mr. Hill was having with a sales representative. In other words, Parks alleged that Mr. Hill made up a rumor that he was

6

having an affair, and attributed the origin of that rumor to Mrs. Parks in order to get her fired from Alpharma. In any event, Parks voluntarily dismissed this lawsuit in March 2008 when she was told that maintaining the lawsuit could complicate the government's investigation into her *qui tam* complaint. Parks Dep. 243-46.

In July 2009, Parks filed another lawsuit, this time in the Circuit Court for Baltimore City alleging that she had been wrongfully terminated as a result of her complaints regarding the safety and propriety of Alpharma's marketing of Kadian. *See* Parks Dep. 173, Ex. 45. Parks has acknowledged that this state court action is based largely on the same facts as her claim in this case. This state court case was dismissed for failure to state a claim upon which relief could be granted, and is now pending on appeal before the Court of Appeals of Maryland. *See Parks v. Alpharma, Inc.*, 10 A.3d 199 (Md. 2010).

Alpharma has moved for summary judgment on the sole remaining count in Parks's False Claims Act retaliation case. In support of its motion for summary judgment, Alpharma argues that Mrs. Parks has not engaged in protected activity, that she did nothing to put Alpharma on notice of the possibility of a *qui tam* action, and finally, that Mrs. Parks has failed to produce any evidence suggesting a causal connection between her alleged protected activity and her ultimate termination.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law."

7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50. This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

## ANALYSIS

The False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, prohibits persons and entities from knowingly presenting false or fraudulent claims to the federal government for payment or approval. The FCA may be enforced through its *qui tam* provisions which allow private individuals to initiate civil actions on behalf of the United States. *See* 31 U.S.C. § 3730(b). Section 3730(h) of the FCA, often referred to as the "whistleblower" provision of the Act, "prevents the harassment, retaliation, or threatening of employees who assist in or

bring *qui tam* actions." *Zahodnick v. IBM Corp.*, 135 F.3d 911, 914 (4th Cir. 1997). That provision states:

> An employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms or conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h).[4]

A prima facie case of retaliation under the FCA requires a plaintiff to establish that (1) she took action "in furtherance" of a *qui tam* suit, *i.e.*, engaged in "protected activity," (2) her employer knew of this action, and (3) her employer retaliated against her as a result of her actions. *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 866 (4th Cir. 1999) (quoting *Zahodnick*, 135 F.3d at 914). For the reasons that follow, this Court holds Mrs. Parks has failed to satisfy two of the three elements required in this cause of action.

## I. The "Protected Activity" Requirement

The "protected activity" requirement of a FCA retaliation cause of action requires that an employee take some action "in furtherance" of a *qui tam* suit. 31 U.S.C. § 3730(h). Actions in furtherance of a *qui tam* suit include "situations in which litigation could be filed legitimately and excludes those in which an employee . . . fabricates a tale of fraud to extract concessions from the employer, or . . . just imagines fraud but lacks proof." *Mann v. Heckler*

---

[4] Congress amended this section in 2009 to include contractors and agents. *See* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(f). However, those amendments are not retroactive. Because the relevant conduct in this case occurred prior to the amendment date, the amended version of the statute does not apply. However, even if the amendments were retroactive, it would not change this Court's analysis.

9

*& Koch Defense, Inc.*, 630 F.3d 338, 344 (4th Cir. 2010) (internal quotation marks and citation omitted). A plaintiff engages in protected activity when she satisfies what has been termed the "distinct possibility" standard. *Id.* "Under this standard, protected activity occurs when an employee's opposition to fraud takes place in a context where 'litigation is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when . . . litigation is a reasonable possibility.'" *Id.* (quoting *Eberhardt*, 167 F.3d at 869). Importantly, an employee's investigations regarding her employer are only protected if the investigation concerns false or fraudulent claims. *See Eberhardt*, 167 F.3d at 868; *Mann*, 630 F.3d at 345-46 ("The FCA's scope is commensurate with its purpose. It covers only fraudulent claims against the United States; without fraud, there can be no FCA action."). In other words, for Parks to be protected by the whistleblower provision of the FCA, there must be some nexus between any purported "protected activity" and a false or fraudulent claim submitted to the government. *See U.S. ex rel. Brooks v. Lockheed Martin Corp.*, 423 F. Supp. 2d 522,

Alpharma argues that Parks has failed to prove any nexus between her purported protected activity and any false or fraudulent claims submitted to the government. Alpharma argues that Parks's allegations essentially concern regulatory violations, that by themselves, do not amount to violations of the FCA. Parks argues that she has indeed met her burden, and that there exists a sufficient dispute of material facts so as to allow her retaliation case to move forward. Specifically, Parks claims that she engaged in protected activity with regard to five "fraudulent schemes" allegedly perpetrated by Alpharma: (1) Alpharma's decision to "bury" the results of Dr. Kaplan's "switch" study; (2) an illegal marketing campaign whereby Alpharma sales representatives promoted the drug Kadian

10

pursuant to a drug conversion method created by Dr. Kaplan; (3) Dr. Kaplan's allegedly "off-label" presentation to Coventry Health Care and Alpharma's payment of compensation for that presentation; (4) Alpharma's promotion of Kadian as safe when ingested with alcohol; and (5) Alpharma's promotion of Kadian as less susceptible to abuse and diversion than other opioids.

With regard to the Kaplan "switch" study, Parks argues that the study showed that Kadian had a negative pharmacoeconomic result, *i.e.*, it was not cost-effective, and as a result, Alpharma "buried" the results. Parks asserts that she made numerous complaints to Alpharma management regarding the switch study, and that these complaints amount to "protected activity" under the FCA. *See* Pl.'s Opp. 11-12, 31. Alpharma argues that Parks propounds no actual evidence that Alpharma "buried" the switch study, and that even if there were such evidence, and Parks actually made the complaints she alleges, there still remains no nexus between burying the results of a study and a false or fraudulent claim to the government. Parks contends that by burying the negative pharmacoeconomic results of the study, Alpharma was able to represent to the government that Kadian was cost-effective, and that by doing so, Kadian would continue to be prescribed under government programs such as Medicare and Medicaid.

Parks makes similar arguments with regard to the other four fraudulent schemes in which she alleges Alpharma participated. In particular, she focuses on alleged off-label marketing of Kadian by Alpharma. As previously mentioned, physicians are free to prescribe drugs for uses not approved by the FDA, but pharmaceutical companies are proscribed from marketing drugs for such off-label uses. Parks essentially argues that she

11

complained about various off-label marketing tactics by Alpharma, and that her complaints constitute protected activity under the FCA because the term "off-label" is synonymous with "fraudulent" or "illegal" in the pharmaceutical industry. In other words, by voicing her concerns related to off-label marketing of Kadian, Parks argues that she was putting Alpharma on notice that *qui tam* litigation was a distinct possibility.

This Court has previously noted that the "protected activity" element of FCA retaliation cause of action should be interpreted broadly, and that the type of activity that Parks claims she engaged in—internal reporting of allegedly fraudulent or false claims—qualifies as activity protected by the whistleblower provision of the FCA. *See U.S. ex rel. Ackley v. Intn'l Bus. Mach. Corp.*, 110 F. Supp. 2d 395, 400 (D. Md. 2000). In light of all of Parks's allegations, this Court concludes that Parks has met her burden on the first element of her cause of action. Parks has not, however, met her burden on the second and third elements.

## II. The Notice Requirement

Alpharma argues that even if Parks sufficiently alleged that she engaged in protected activity, she nevertheless fails to plead any facts sufficient to show that Alpharma was aware, and had notice of, her protected conduct. This second prong of this analysis is related to the first, but regardless of whether an employee engaged in protected activity, her employer must have a sufficient amount of knowledge regarding that protected activity so as to be put on notice of the possibility of future *qui tam* litigation. The employer must have knowledge or notice of the possibility of *qui tam* litigation, because without that requisite knowledge, it would be impossible for the employer to retaliate against the employee. *See U.S. ex rel.*

12

*Yesudian v. Howard Univ.*, 153 F.3d 731, 744 (D.C. Cir. 1998) ("unless the employer is aware that the employee is investigating fraud, . . . the employer could not possess the retaliatory intent necessary to establish a violation of § 3730(h)") (internal quotation marks and citation omitted). The Fourth Circuit has explained the notice requirement:

> Such notice can be accomplished by expressly stating an intention to bring a *qui tam* suit, but it may also be accomplished by any action which a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility. Such actions would include, but are not limited to, characterizing the employer's conduct as illegal or fraudulent or recommending that legal counsel become involved. These types of actions are sufficient because they let the employer know, regardless of whether the employee's job duties include investigating potential fraud, that litigation is a reasonable possibility.

*Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 868 (4th Cir. 1999).

Here, it is undisputed that Parks never used the terms "fraudulent" or "false" in any of the complaints she may have made to Alpharma. Such conduct would likely put Alpharma on notice of the possibility of a *qui tam* suit. However, using such buzzwords is not necessary. The central question is "whether what [Parks] told [her] superiors was sufficiently suggestive of fraud or falsity that [Alpharma] should have reasonably understood the possible follow-on of *qui tam* litigation." *Ackley*, 110 F. Supp. 2d at 401. Parks alleges that she made numerous complaints regarding Alpharma's marketing of Kadian, and the strongest point in her favor is her contention that she complained about "off-label" marketing with regard to the drug. Standing alone, a complaint regarding off-label marketing might, under the right circumstances, suffice to put a pharmaceutical company on notice regarding the possibility of *qui tam* litigation. However, at every turn, Plaintiff's own words and actions belie her alleged concerns regarding fraud or illegality on the part of Alpharma.

13

She actively promoted Dr. Kaplan, pleaded with Alpharma management to fund Dr. Kaplan's switch study, prepared the slides about which she now complains, suggested other ways to market Kadian, and generally was very supportive in the marketing of Kadian. In that context, and even taking Parks's allegations in the most favorable light, this Court cannot conclude that Parks's complaints were sufficiently suggestive of fraud so as to put Alpharma on notice of the possibility of *qui tam* litigation. Because Parks cannot prove that Alpharma had notice of her alleged protected activity, her FCA retaliation cause of action must fail.

## III. The Retaliation Requirement

Even if Parks had proved the notice requirement, her claims nevertheless fail on the third element—that is, she cannot prove that Alpharma retaliated against her "as a result of" her protected activity. *See Zahodnick v. IBM Corp.*, 135 F.3d 911, 914 (4th Cir. 1997). To establish a retaliation claim under the FCA, Parks must demonstrate some causal connection between her alleged protected activity and her termination. *Id.* Parks primarily relies on a temporal proximity argument—*i.e.*, she engaged in protected activity, was terminated shortly thereafter, so *ipso facto* her termination was a result of her protected activity. However, the Fourth Circuit has noted that "the passage of time alone cannot provide proof of causation unless the 'temporal proximity between an employer's knowledge of protected activity and an adverse employment action' was 'very close.'" *Pascual v. Lowe's Home Centers, Inc.*, 193 Fed. App'x 229, 233 (4th Cir. 2006) (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). Here, the amount of time between any alleged protected activity and Parks's

14

termination is not "very close," and cannot serve as a basis for finding that Alpharma retaliated against her.

Moreover, it cannot be ignored that Alpharma has produced numerous exhibits and documents that bolster its contention that Parks was terminated as a result of employee complaints regarding her behavior. Parks argues that she did not engage in the conduct complained of by her co-workers, but importantly, she does not challenge Alpharma's assertion that her co-workers actually made complaints. Ms. Donohue, Alpharma's Director of Human Resources, faced with numerous complaints regarding Parks's morale depleting behavior, conducted an investigation and shared the results of that investigation with Parks. Importantly, no disciplinary action was taken against Parks at this time. She was told to keep the details of the investigation confidential. Although Parks claims that she did keep the investigation confidential, Ms. Donohue nevertheless received more complaints that suggested Parks had been discussing the details of the investigation with her co-workers. At this point, Ms. Donohue consulted with Alpharma's in-house, and outside counsel and made the decision to terminate Parks's employment. Whether or not Parks actually engaged in the behavior included in the complaints levied against her is beside the point—Ms. Donohue received numerous complaints and honestly believed that Parks deserved to be discharged. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 216-17 (holding that it is the perception of the decisionmaker—and not whether the conduct at issue actually occurred—that is relevant in the retaliatory termination analysis). As a result, Parks has put forth no evidence tending to show that the reasons relied on by Alpharma in making the decision to terminate Parks were false, or were in any way pretextual.

Finally, it bears mentioning that in 2007, after filing the present action, Parks filed a lawsuit in the Circuit Court of Maryland for Baltimore County alleging that she was terminated as a "direct and proximate consequence" of a conspiracy to defame her. In her deposition, Parks testified that she "absolutely believe[s]" that the allegations in her defamation lawsuit are "true and accurate." Pl.'s Dep. 215. Aside from arguing that she was "up against a statutory deadline," Parks has not reconciled how, in one lawsuit she was fired as a result of a defamation conspiracy, and in another suit was fired as a result of retaliation for her protected activity under the FCA. Although Parks dismissed that state court lawsuit, she did not change her mind as to the reason for her termination—she dismissed the suit because she was told that her state action "could complicate the government's investigation." *Id.* at 244. Put simply, this contradiction seriously undermines Parks's contentions that she was fired as a result of her protected activity. In conjunction with Alpharma's proffered valid reasons for terminating Parks, she has not met her burden and cannot prove a causal connection between her alleged protected activity and he termination. For this reason, her FCA retaliation claim must fail.

## CONCLUSION

For the aforementioned reasons, Defendant Alpharma's Motion for Summary Judgment (ECF No. 69) is GRANTED. A separate Order follows.

Dated: April 11, 2011

/s/_____
Richard D. Bennett
United States District Judge